UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES GOODREAU AND ) | |
| ANN GOODREAU ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-11611 WGY |
| ) | |
| ICS, BLOUNT INC. ) | |

PETITION FOR APPROVAL OF SETTLEMENT
PURSUANT TO G.L. c. 152 § 15

### I. Plaintiff's Position

#### Liability

As of December 13, 2004, Mr. Goodreau was working as a concrete cutter for Pro Cut, Inc. On that date, Mr. Goodreau was assigned to a job site at a residence located at 175 Middlesex Street in Brookline, Massachusetts. The residence was in the process of being renovated, and Pro Cut, Inc. was hired to do concrete cutting. Mr. Goodreau was instructed to make horizontal cuts off the top of an approximately 16-inch or 17-inch thick bulkhead to create space for a new doorway. The bulkhead consisted essentially of a stairwell positioned outside the foundation of the residence running from ground level to basement level and culminating in a walkway at basement level.

To accomplish the task at hand, Mr. Goodreau positioned himself inside the bulkhead, in a hole that was approximately 6-feet deep, 4-feet wide, and 6-feet long. Because the cement was 16-inches or 17-inches thick, Mr. Goodreau cut the first 12-inches of the wall using a 30-inch, 250 blade circular track saw so that he could then slide his chainsaw into the existing cut line to complete the cut. Mr. Goodreau cut the first 12-inches of cement without incident.

Once the cut line was established, Mr. Goodreau then placed the aforementioned track saw on the ground to his side and retrieved a chainsaw, an ICS 853PRO Plus Hydraulic Concrete Saw, to complete the cut. Using this chainsaw, Mr. Goodreau cut through approximately 2/3 of the remaining wall; approximately four bricks down. At that point, the chain suddenly and without warning snapped. The chain broke from the guide bar of the chainsaw and, nearly instantaneously, the broken section of the chain whipped downward and cut into Mr. Goodreau's

lower right leg and calf.  The Plaintiffs claim that there was no device known as a chain catcher on the ICS 853PRO Plus Hydraulic Saw that Mr. Goodreau was using.

### Negligent Design and Breach of Warranty

The ICS 853PRO Plus Hydraulic Saw involved in Mr. Goodreau's accident was purposefully designed to allow laborers, such as Mr. Goodreau, to cut through concrete walls and pillars, the very task Mr. Goodreau had undertaken on December 13, 2004.  The chainsaw was designed by ICS, Blount, Inc., which marketed the product as fast, efficient, and easy to use.  However, the design of the ICS 853PRO Plus Hydraulic Saw makes it extremely unsafe to operate.

An engineering expert, Robert Holt, will testify that, since the ICS 853PRO Plus Hydraulic Saw was designed for everyday use by professional concrete cutters, including cuts ranging from small mechanical openings to deep plunge cuts up to 24 inches, the risk of the chain breaking and whipping backward was a risk that the manufacturer of the chainsaw should have reasonably foreseen.  Mr. Holt will testify that a device referred to as a chain catcher is typically made of metal or hard plastic and is typically located under the clutch cover.  The chain catcher is designed to catch a broken or jumping chain and prevent the chain from whipping off the guide bar and onto the operator's leg.

Given the high speed of the chain combined with the aggressive and forceful movements necessary on behalf of the operator to effectuate the stated function of the ICS 853PRO Plus Hydraulic Saw, adequate design is essential.  The Plaintiffs claim that this model was not designed adequately.

Industry standards place an affirmative duty on manufacturers to insure that the operators of their products will be free from reasonably foreseeable hazards.  The Plaintiffs claim that ICS, Blount, Inc. knew, or should have known, that the chain breaking and whipping was a risk that could reasonably put the user of its product in danger of suffering severe physical injuries.  In fact, the 853PRO operator's manual provides that "[c]hain breakage can result in high-speed ejection of parts, which can result in death or serious personal injury to operators."  To prevent this result, the manual suggests that the product not be operated "with a damaged, modified, or broken side cover or baffle drain.  The side cover and baffle drain provides protection against

contact with moving parts, ejected debris, broken chain, thrown water and concrete slurry." Id. Importantly, the manual is entirely silent as to the fact that this particular product did not have a chain catcher.

There is no dispute that ICS, Blount, Inc. designed and manufactured the ICS 853PRO Plus Hydraulic Saw and placed said product into the channels of commerce. Accordingly, the Plaintiffs claim that ICS, Blount, Inc. had an affirmative duty to design the chainsaw in a manner that reasonable allocated for any and all foreseeable risks inherent in its use. The chain breaking constitutes such a risk, and was contemplated by ICS, Blount, Inc., as evidenced by its mention in the Operator's Manual. Therefore, the Plaintiffs claim that the failure to either include a chain catcher or warn consumers of the fact that the product does not have a chain catcher constitutes a design defect and a breach of warranty in violation of the manufacturer's legal obligations.

### Damages

When the chain broke from the guide bar, it whipped backwards and struck Mr. Goodreau in the vicinity of his right leg and shin. The impact caused an open, wedge-type fracture of Mr. Goodreau's right tibia, as well as several lacerations along the front and middle aspect of the tibia. Mr. Goodreau was immediately transported via ambulance to the Faulkner Hospital where he was admitted in the Emergency Department with an "open mid shaft tibia-fibular fracture right leg." An X-Ray taken at the Faulkner Hospital confirmed that Mr. Goodreau's tibia was fractured. Dr. Andrew Deane splinted the injury and transferred Mr. Goodreau, via ambulance to Brigham and Women's Hospital for further orthopedic follow-up on his injuries.

He was seen at Brigham and Women's Hospital by Dr. Mitchell Harris. Dr. Harris diagnosed a right tibia fracture and Mr. Goodreau was cleared for anesthesia and brought into the operating room to repair his tibia. Mr. Goodreau had an intramedullary rod surgically inserted in his right leg. The multiple lacerations were connected by the blade and the skin, subcutaneous tissue and a minimal amount of the deep posterior musculature were excised. The tibia fracture required two to three pieces of bone to be removed. The wound was irrigated with several liters of crystalloid, and tenaculums were used to anatomically reduce the fracture. A plate with three interlocking screws was inserted into the tibia. The Operative Note mentions that the impact from the chain caused "serial lacerations along the anteromedial aspect of the tibia, medial

compartment and causing a wedge type fracture of the tibia."

On December 15, 2004, Mr. Goodreau again received physical therapy treatment from Dr. Carmada, who noted that the patient still has decreased stair climbing ability and increased dizziness when transitioning from sitting to standing or other, similar activity.  Medications included Colace 100 mgs, Gentamicin Sulfate 80 mgs, Flagyl 500 mgs, Lovenox 40 mgs, and Oxycodone 5-10 mgs, as well as the Tylenol and Benadryl for headache and insomnia.

On December 16, 2004, Mr. Goodreau was discharged to home care physical therapy.  On discharge, Mr. Goodreau was wearing an aircast boot and using crutches.

Mr. Goodreau began home care physical therapy on December 17, 2004.  This treatment included physical therapy, mental status assessment, pain status, skin status, safety, and infection status.

On December 27, 2004, at a follow up appointment with Dr. Harris at Brigham and Women's Hospital, Mr. Goodreau had the sutures and staples from the surgical site removed.  X-rays at this point showed the plate with three interlocking screws maintaining spiral tibial fracture and demonstrated interval removal of surgical drain.  Mr. Goodreau was provided with Lovenox to be applied daily, as well as Oxycodone for his pain.

Mr. Goodreau's home care physical therapy was discharged on February 17, 2005.  On February 24, 2005, he went to Brockton Hospital on referral from Dr. Harris for further physical therapy.  The records from Brockton Hospital note that Mr. Goodreau was experiencing stiffness, numbness, pins and needles, as well as pain in his right leg.  Mr. Goodreau then returned to Brockton Hospital for physical therapy treatment twice a week through April 8, 2005.

Subsequently, following two additional visits to Dr. Harris, Mr. Goodreau began a work hardening program at Caritas Good Samaritan Occupational Health Services on April 13, 2005, four months removed from the date of the accident, at the request of Dr. Harris.  The physical therapist, Angela Balsamo, noted that Mr. Goodreau presented with decreased functional tolerances and, therefore, would benefit from progressive strength training three times a week for six weeks.  He was discharged from the work hardening program on June 3, 2005.  Upon being discharged, Mr. Goodreau still complained of knee pain in conjunction with forceful extension.  He was to continue with his home exercise program after discharge.

In a follow up visit with Dr. Harris on June 6, 2005, Mr. Goodreau was still having

occasional soreness in the leg and knee pain on full extension. However, because the patient "has worked diligently to improve," Dr. Harris felt that it was safe for him to return to work at this point.

Mr. Goodreau returned to work in mid-June of 2005, approximately six months after his accident. However, Mr. Goodreau began to experience sharp pain in his ankle that made it difficult for him to walk. In a July 21, 2005 follow up visit with Dr. Harris, Mr. Goodreau related that his pain in his ankle had increased with weight bearing. An MRI revealed a "sprain pattern of the ankle that involves deltoid and posterior talofibular ligament. Tenosynovitis of the posterior tibialis with tendonitis before its insertion. Tendinopathy vs. partial tear of the peroneus brevis tendon distal to the lateral malleolus." As such, on July 21, 2005, Mr. Goodreau's injuries once against caused to him to miss work.

On July 28, 2005, Mr. Goodreau was seen by Dr. Mark Vrahas, an Orthopedic Surgeon at Brigham and Women's Hospital, who thought that the inflammation Mr. Goodreau was experiencing was the result of the leg injury. Dr. Vrahas' office note indicates that "realistically the patient with an injury to the leg as severe as his will require a year before reaching maximum medical improvement and could determine if he was going to be able to return to heavy laboring job like he has."

On August 3, 2005, Mr. Goodreau began orthopedic treatment with Dr. James Karlson of ProSports Orthopedics. On examination, Dr. Karslon noted some mild deformity about the lower leg consistent with prior soft tissue injury. At the request of Dr. Karlson, Mr. Goodreau had a bone scan on August 11, 2005, and again on August 18, 2005, both exams taken at New England Baptist Hospital. These examinations noted that the "focal increased uptake in the posterior mid tibia may relate to previous fracture and increased uptake proximally may also relate to surgical intervention" and also that "post-traumatic changes medial malleolus and intremedullary nail transfixing the tibial diaphysis."

On August 24, 2005, Mr. Goodreau returned to Dr. Karlson for a follow up visit. Mr. Goodreau reported improvement of his ankle pain with rest. Dr. Karlson advised Mr. Goodreau to advance his activities as tolerated. He would advance his lifting and carrying activities through an independent exercise program. Dr. Karlson expected an attempt to return to work full duty.

In all, Mr. Goodreau incurred medical expenses in connection with service rendered as a result of this accident totaling $45,803.59, all of which were paid by the workers' compensation carrier, A.I.M. Mutual Insurance Company. Additionally, Mr. Goodreau was out of work from December 13, 2004 through September 26, 2005, returning to work only for a short period of 2-3 weeks in June/July of 2005. In the years immediately preceding the accident, Mr. Goodreau made $58,191.93 in 2002, $63,433.30 in 2003, and $61,712 in 2004, prior to suffering his injury on December 13, 2004. As such, Mr. Goodreau's average weekly wage at the time of the accident was approximately $1,200. Therefore, as Mr. Goodreau was out of work for 35 weeks, he sustained lost wages in the amount of $42,000. He received workers' compensation indemnity payments for this missing time from work. Mr. Goodreau's current workers' compensation lien is currently $75,606.31.

Mr. Goodreau's wife, Ann Goodreau, has also been affected by her husband's injuries and has suffered the loss of her husband's consortium and society as a result of his injuries. James and Ann Goodreau have been married for 23 years. For the period of time that Mr. Goodreau was unable to work, home life was extremely difficult. Prior to this accident, Ms. Goodreau had a back injury and, as a result, she was dependent on her husband. Her husband's injury and the uncertainty of his recovery led to friction in their relationship. Therefore, the cumulation of both of these injuries caused Mrs. Goodreau to sustain a loss.

## II. DEFENDANT'S POSITION

It is the Defendant's position that the ICS 853PRO Plus Hydraulic Concrete Saw being used by Mr. Goodreau on December 13, 2004 was sold with a rubber guard which would have prevented the accident. It is the Defendant's position that Mr. Goodreau, or some representative of Pro Cut, Inc., removed said guard at some point prior to its use on the day of the accident. It is not in dispute that the rubber guard was not present at the time of the accident. In addition, defendant's design incorporates a chain catcher. Plaintiff's defect allegations reflect a complete misunderstanding as to the design of the saw at issue as well as the function of chain catchers.

## III. SETTLEMENT

After extensive negotiations and a mediation, the parties have agreed to settle James

Goodreau's claim for $45,000 and Anne Goodreau's claim for $15,000, for a total settlement amount of $60,000. Keches & Mallen, P.C. has a contingency fee agreement for 38% (CFA Attached at Tab 1) but for purposes of facilitating a settlement has agreed to reduce that percentage to a one-third percentage for a contingent fee of $20,000. In addition, Keches & Mallen, P.C. has expenses in the amount of $2,875.66. (Breakdown of Expenses Attached at Tab 2.)

With respect to the workers' compensation carrier, there is some evidence in this case that Mr. Goodreau's employer, Pro Cut, Inc., engaged in wilful misconduct that could subject them to sanctions pursuant to M.G.L. ch. 158, § 28.[1] This claim would include that the rubber guard had been removed and the replacement guard would only cost $9.50. In exchange for waiving the §28 claim, the workers' compensation insurer has agreed to accept a net recover of $13,921.63.

With respect to James Goodreau's claim, the Plaintiffs have agreed to accept $45,000 to settle that claim, minus 1/3 of attorney's fees ($15,000) and 75% of the total expenses ($2,156.74), leaving a balance of $27,843.26. Mr. Goodreau and the lien holder have agreed to split this equally, with each receiving $13,921.63.

Pursuant to Hunter v. Midwest Coast Transport, Inc., 400 Mass. 779 (1987), the workers' compensation carrier will pay 38.12% of any future benefits until it has exhausted its offset of $13,921.63, leaving the employee responsible for paying $13,921.63 (offset amount). Thereafter, the workers' compensation insurer will pay 100% of any c. 152 benefits which become due. It should be noted that Mr. Goodreau has been back to work for over one year and has not sought any recent medical care.

With respect to Ann Goodreau's consortium claim, the Plaintiffs have agreed to accept $15,000 to settle that claim, minus 1/3 of the attorney's fees ($5,000), and 25% of the attorney's expenses ($718.91), leaving a net recovery in the amount of $9,281.09.

The settlement will break down as follows:

**Gross Settlement to James and Ann Goodreau          $60,000.00**

---

[1] Mass. Gen. Law. ch. 152, § 28 provides that "[i]f the employee is injured by reason of the serious and wilful misconduct of an employer or of any person regularly intrusted with and exercising the powers of superintendence, the amounts of compensation hereinafter provided shall be doubled."

Disbursement:

**James Goodreau**                                                                 **$13,921.63**

$45,000.00 / 2 = $22,500, less 1/3 attorney's fees ($7,500) = $15,000, less 50% of $2,156.74 (75% of total expenses) ($1,078.37).

**Ann Goodreau**                                                                    **$9,281.09**

$15,000, less 1/3 attorney's fees ($5,000), less 25% of expenses ($718.91).

**A.I.M. Mutual Insurance Company**                                     **$13,921.63**

Gross workers' compensation lien of $75,606.31 reduced to a gross of $22,500, less 1/3 attorney's fees ($7,500) = $15,000, less 50% of $2,156.74 (75% of total expenses) ($1,078.37).

**Keches & Mallen, P.C. Fee**                                                **$20,000**

Contingent Fee of 38% reduced to a one-third percentage. $5,000 of this fee comes from Ann Goudreau; $7,500 comes from James Goodreau; and the remaining $7,500 comes from A.I.M. Mutual Insurance Company.

**Keches & Mallen, P.C. Expenses**                                       **$2,875.66**

## IV.  Jurisdiction

Jurisdiction over the instant Petition is expressly conferred upon this Court by M.G.L. Chapter 152 § 15, which states that the Petition requires "the approval of ... the court in which the action has been commenced."

## V. Conclusion

For the reasons stated herein, the Parties respectfully request that this honorable Court approve this Petition.

        s/ Brian C. Dever
        Brian C. Dever, Esq.-BBO #544203
        KECHES & MALLEN, P.C.
        122 Dean Street
        Taunton, MA 02780
        508-822-2000
        ATTORNEY FOR PLAINTIFFS

        s/ John F. Kelleher
        John F. Kelleher, Esq.-BBO #600176
        Higgins, Cavanagh & Cooney, LLP
        The Hay Building
        123 Dyer Street
        Providence, RI 02903-3987
        Tel. No. (401) 272-3500
        ATTORNEY FOR DEFENDANTS

        s/ Ivana Jacobs
        Ivana Jacobs
        A.I.M. Mutual Insurance Company
        P.O. Box 4070
        Burlington, MA 01803
        Tel. No. (781) 2211600
        For the Workers' Compensation Carrier

## CONFIRMATION OF AGREEMENT BY PLAINTIFFS

We, James Goodreau and Ann Goodreau, hereby state under the penalties of perjury, that we have read the foregoing Petition and that the terms of the settlement have been explained to us by our counsel. We realize that by agreeing to the settlement, we are forever terminating all our rights, claims, and causes of action of every kind and nature against the Defendant in this action, its servants, agents and employees arising out of James' accident of December 13, 2004. In light of the above facts, we formally confirm that we desire this case be settled in accordance with the above terms and conditions.

_____                                              _____
Date                                                                                     James Goodreau


_____                                              _____
Date                                                                                     Ann Goodreau